[No. G037749. Fourth Dist., Div. Three. Apr. 23, 2008.]

MARGARET UNRUH-HAXTON et al., Plaintiffs and Appellants, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents. [And seven other cases.*]

---

*Cachu v. Regents of University of California* (No. 03CC00440); *Elison v. Regents of University of California* (No. 03CC00443); *Durant v. Regents of University of California* (No. 03CC00500); *Crawford v. Regents of University of California* (No. 03CC00442); *Roule v. Regents of University of California* (No. 00CC06211); *Ruhl v. Regents of University of California* (No. 03CC00445); *Kirk v. Regents of University of California* (No. 03CC00578).

344

**COUNSEL**

Niddrie, Fish & Buchanan and Martin N. Buchanan for Plaintiffs and Appellants.

Beam, Brobeck, West, Borges & Rosa, Byron J. Beam; Greines, Martin, Stein & Richland, Martin Stein, Carolyn Oill and Lillie Hsu for Defendant and Respondent, The Regents of the University of California.

Carroll, Kelly, Trotter, Franzen & McKenna, Mark V. Franzen, Dimitriy Cherepinskiy and David P. Pruett for Defendants and Respondents, Garden Grove Hospital and Medical Center and Tenet Healthcare Corporation.

## OPINION

**O'LEARY, J.**—This appeal involves eight cases brought by patients who received fertility treatments from two doctors in the late 1980's at a clinic located in Garden Grove. In 1995, it was reported by several news sources that the doctors had been stealing human genetic material from patients receiving fertility treatments. The patients allege in their complaints that they were unaware they were potential victims until after 2000, and filed their lawsuits within one year of discovering their claims. The trial court sustained defense demurrers finding the actions were time-barred under Code of Civil Procedure section 340.5.[1] The court took judicial notice of approximately 100 news articles and press releases regarding the scandal and determined the couples should have suspected wrongdoing, i.e., constructive suspicion. The court also determined the doctors were not acting within the course and scope of their employment as a matter of law.

In this appeal, the patients challenge these rulings, arguing knowledge of harm cannot be imputed based solely on media coverage. They contend the date of discovery cannot be determined as a matter of law, nor can the issue of whether the doctors were acting within the scope and course of their employment. Finally, the patients challenge the court's decision to apply the Medical Injury Compensation Reform Act (MICRA) statute of limitations to their complaints, which raise intentional torts. Their contentions have merit. Applying the applicable statutes of limitations, we conclude the judgment must be reversed in part and affirmed in part.

I

### FACTS

Because this case arises from orders sustaining defendants' demurrers, we review plaintiffs' complaints de novo to determine whether the allegations of facts are sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

The following is a summary of the allegations common to all plaintiffs (seven married couples and one unmarried woman, hereafter collectively referred to as the patients).[2] The patients received medical treatments at the

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise stated.

[2] The patients are (1) Gracie and Robert Cachu; (2) Rosalinda and Layne Elison; (3) Janice and Stephen Durant; (4) Shirel and Steve Crawford; (5) Lynda and Stephen Roule; (6) Elizabeth and Mark Ruhl; (7) Margaret Unruh-Haxton and Jerry Unruh; and (8) Julie Kirk.

Center for Reproductive Health (the Fertility Clinic) located in the Garden Grove Hospital and Medical Center (the Medical Center). The Fertility Clinic was owned and operated by the Regents of the University of California (the Regents), affiliated with the University of California Irvine Medical Center (UCI). The Regents hired Drs. Ricardo Asch and Jose Balmaceda (the doctors) to work at the clinic.

At the time, the Medical Center was owned by American Medical International, Inc., but it was later sold to Tenet Healthcare (collectively, the Medical Center). The doctors, the Regents, and the Medical Center entered into a joint venture agreement to share the profits of the Fertility Clinic.

The women patients claim they each received a fertility drug before undergoing a laparoscopy and/or transvaginal aspiration performed by the doctors. The drug caused their bodies to produce multiple eggs, which then could be collected and fertilized outside the women's bodies (creating a pre-embryo).[3] These fertilized eggs could be transferred back to the women's fallopian tubes or frozen for later use.

Each of the women in this lawsuit had her eggs harvested by the doctors in the late 1980's. After the procedure, some women were told their eggs were unsuitable for fertilization, and some women were told their eggs had been fertilized and the pre-embryos had been frozen for their future use. The patients alleged the doctors were lying and in fact stole their eggs and pre-embryos. The doctors sold some of the genetic material for research and implanted some pre-embryos into different women, possibly resulting in live births. None of the women in this case consented to have their eggs or pre-embryos donated or used for any purpose other than for their own fertility treatments and their own desire to have a child.

In May 1995, the Orange County Register newspaper first reported the doctors had stolen eggs/pre-embryos from one or two patients. In June, it was reported a UCI nurse told a Senate committee that there were perhaps 10 victims. The following month that number was increased to 30 in a UCI press release. Later reports increased the number to 304 victims. All the while, the doctors publicly denied any wrongdoing. The Regents sought judicial notice of a total of 93 newspaper articles and seven UCI press releases published between May 1995 and July 1999. The majority of the newspaper articles (81) appeared during the first year of media coverage. And of the total, 85 of the articles appeared in the Orange County Register or the Los Angeles

---

[3] An egg fertilized inside a woman's body is an embryo, and an egg fertilized outside a woman's body is commonly referred to as a pre-embryo.

Times newspaper. No articles appeared in any San Diego editions of newspapers, which was where some of the patients resided.

All eight complaints make the following allegations: The Regents copied all the patient records at the Fertility Clinic, and copies of the records were sent to the office of the vice-chancellor at UCI. The Regents then filed a lawsuit against the doctors alleging they were hindering an investigation by the National Institutes of Health concerning the Fertility Clinic's research protocols. In that same month, the Regents amended their complaint to allege the doctors had taken eggs without the patients' consent and implanted them as embryos in other patients. Although the Regents possessed medical records showing the eight women in this appeal were victims, they did not contact the victims. To the contrary, some patients allege that when the newspapers were reporting the scandal, the Regents were denying any wrongdoing. Chancellor Laurel Wilkening publicly promised the Regents would contact and notify all potential victims, but they did not.

The three UCI employees who were the whistleblowers on the egg scandal were fired. When they filed a whistleblower suit, the Regents reached a $1 million settlement conditioned on a specific nondisclosure/confidentiality agreement. In return for the money, the employees were prohibited from contacting former patients who were victims.

The patients allege Linda Granell, the director of the University of California Irvine School of Medicine, was asked by the Regents to act as spokesperson on the scandal. It is alleged the Regents asked her to lie and deceive the media. "She stated: 'I was told to say (in a press release) the University had determined that patients were not at risk. I questioned that repeatedly, and was told patient health was not at risk. I said maybe their health was not at risk, but I really don't think I can say patients are not at risk.' This is the way the Regents responded to the media. They went out of their way to deceive and mislead the public into thinking that no one was actually victimized."

The victims later learned some of the Fertility Clinic's staff, including Biologist Terri Ord, were asked to keep track of the stolen pre-embryos, how they were used, and who received them. For her protection, Ord secretly kept her own list of the victims and the recipients of the eggs/pre-embryos (hereafter the Ord list). It was alleged the doctors sought out women in their 30's who had medical insurance to pay for the harvesting procedure.

The patients in this case were all treated by the doctors at the Fertility Clinic between 1987 and 1994. Their names were all on the Ord list. The patients assert they did not know they were victims until one year before

filing their complaints. Three couples alleged they were completely unaware of the media coverage of the scandal. The others asserted they had no reason to suspect they were victims because their names were not mentioned in the newspaper accounts and the Regents gave public assurances that all victims would be notified. A few couples, who contacted the Regents after the media reported the scandal, allege they were misled and deceived into believing they were not harmed. In 2000 and 2003, the couples maintain they learned for the first time that their names were on the Ord list from an attorney who had obtained a copy of the list. Within one year of this discovery, they filed their lawsuits against the Regents. The Medical Center was added soon thereafter via six amended complaints (Kirk and the Elisons did not add the Medical Center). The Roules, who waited six years to amend their complaint, have decided to proceed only against the Regents.

## II

### SHOULD WE APPLY MICRA TO A GENETIC MATERIAL STEALING CASE?

■ "In 1975, the Legislature enacted [MICRA]. In doing so, it ' "attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." [Citation.]' [Citation.] MICRA includes statutes relating to arbitration agreements [citation], contingency fees [citation], notice before bringing suit [citation], the statute of limitations [citation], the collateral source rule [citation], the recoverability of noneconomic damages [citation], and periodic payment of any judgment [citation]. Each of these MICRA statutes states its applicability in terms of the 'professional negligence' of a 'health care provider.' Moreover, each of them defines 'professional negligence' as a 'negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death . . . .' [Citation.]" (*Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1514 [35 Cal.Rptr.3d 612] (*Smith*).)

"In addition, . . . section 425.13, although enacted after MICRA and therefore not actually part of it, applies '[i]n any action for damages arising out of the professional negligence of a health care provider . . . .' [Citation.] It establishes certain procedural hurdles to a claim for punitive damages." (*Smith, supra*, 133 Cal.App.4th at p. 1514.)

■ It is settled that additional causes of action may arise out of the same facts as a medical malpractice action that do not trigger MICRA. (See *Perry v.*

*Shaw* (2001) 88 Cal.App.4th 658, 668–669 [106 Cal.Rptr.2d 70] [MICRA noneconomic damages cap applied to claim based on professional negligence but not to intentional tort claim].) A problem that sometimes arises is when a plaintiff hoping to evade the restrictions of MICRA, will choose to assert intentional torts, "seemingly non-MICRA causes of action. Thus, when a cause of action is asserted against a health care provider on a legal theory other than medical malpractice, the courts must determine whether it is nevertheless based on the 'professional negligence' of the health care provider so as to trigger MICRA." (*Smith, supra,* 133 Cal.App.4th at p. 1514.)

"The answer is sometimes yes and sometimes no, depending on the particular cause of action and the particular MICRA provision at issue. (*Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 214–218 [87 Cal.Rptr.2d 187, 980 P.2d 895] [yes]; *Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 111–116 [83 Cal.Rptr.2d 145, 972 P.2d 966] [yes]; *Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111–117 [32 Cal.Rptr.2d 263, 876 P.2d 1062] [yes]; *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436–439 [220 Cal.Rptr. 666, 709 P.2d 469] [no]; *Hedlund v. Superior Court* (1983) 34 Cal.3d 695, 701–704 [194 Cal.Rptr. 805, 669 P.2d 41] [yes]; see also *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 781–790 [11 Cal.Rptr.3d 222, 86 P.3d 290] . . . [no]; *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 188–191 [10 Cal.Rptr.2d 208, 832 P.2d 924] . . . [yes].) The Supreme Court has cautioned repeatedly that 'the scope and meaning of the phrases "arising from professional negligence" and "based on professional negligence" could vary depending upon the legislative history and "the purpose underlying each of the individual statutes." [Citation.]' [Citation.]" (*Smith, supra,* 133 Cal.App.4th at pp. 1514–1515.)

We find several cases instructive. In *Perry v. Shaw, supra,* 88 Cal.App.4th 658 [106 Cal.Rptr.2d 70] (*Perry*), a woman underwent surgery to remove excess skin from her body following a substantial weight loss. She expressly refused to consent to a breast lift or enlargement. Nevertheless, during the surgery the surgeon enlarged her breasts from a size 34B to a 40DD. A jury awarded her over $1 million in noneconomic damages finding the surgeon liable for both negligence and battery. On appeal, the court was asked to decide whether the award was subject to the MICRA $250,000 limitation on noneconomic damages. (See Civ. Code, § 3333.2.) In *Perry,* the court concluded the limitation did not apply because the intentional tort of battery, which it agreed had been committed in that case, was qualitatively different than professional negligence. (*Perry, supra,* 88 Cal.App.4th at pp. 663–664, 668.)

It reasoned, " 'As our Supreme Court noted in *Cobbs* v. *Grant* [(1972)] 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], there are significant differences between the two theories, including the evidentiary burdens, the availability of punitive damages, and the applicable limitations period: "[M]ost jurisdictions have permitted a doctor in an informed consent [negligence] action to interpose a defense that the disclosure he omitted to make was not required within his medical community. However, expert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent. Moreover, a doctor could be held liable for punitive damages under a battery count, and if held liable for the intentional tort of battery he might not be covered by his malpractice insurance. [Citation.] . . ." [¶] The distinction between negligence and battery was not lost on our Supreme Court, and we do not believe it was lost on the Legislature when it enacted section 364 as a limited exception to the statute of limitations for "professional negligence." Had the Legislature intended section 364, subdivision (d), to extend to causes of action based upon other theories which the plaintiff might wish to include in the complaint, it could have used language which reflected that intent. It did not.' [Citation.]" (*Perry, supra*, 88 Cal.App.4th at p. 666.)

The *Perry* court further reasoned, "[T]here is nothing in the legislative history generally, or with regard to [Civil Code] section 3333.2 specifically, to suggest that the Legislature intended to extend the $250,000 limitation to intentional torts. . . . *Cobbs* v. *Grant*[*, supra*, 8 Cal.3d 229,] was decided *three years before MICRA was enacted*, and the Legislature therefore knew when it defined 'professional negligence' that there existed a species of battery that our highest court had said was *not negligence*. In that context, the only rational conclusion is 'that the words "negligent" and "negligence" were carefully chosen to apply only to causes of action based upon negligence.' [Citations.]" (*Perry, supra*, 88 Cal.App.4th at p. 668, fn. omitted.)

Finally, the *Perry* court noted, "If [Civil Code] section 3333.2 is in fact the most significant limitation created by MICRA, it is also one of the most Draconian. When as a matter of legislative fiat the courts are required to reduce awards of noneconomic damages to $250,000 without regard to the result of a health care provider's negligence—notwithstanding brain damage, paralysis, and other equally devastating injury—the scope of that fiat must be limited to its terms. By its plain language, the cap imposed by [Civil Code] section 3333.2 applies only in actions 'based on professional negligence,' not (like . . . section 425.13) to actions for 'damages arising out of professional negligence.' Whatever argument there may be to support a broad construction of 'arising out of,' we do not think it applies to a statute in which those words were not used. [Citations.] . . . [T]here is nothing in the legislative history of

MICRA or [Civil Code] section 3333.2 to suggest the Legislature intended to exempt intentional wrongdoers from liability by treating such conduct as though it had been nothing more than mere negligence." (*Perry, supra*, 88 Cal.App.4th at pp. 668–669.)

More recently in *Smith, supra*, 133 Cal.App.4th at page 1526, the court held a MICRA provision (§ 364 [tolling provision]) would not apply to elder abuse claims brought against a health care provider. Relying on past authority defining the Elder Abuse Act (Welf. & Inst. Code, § 15657) the *Smith* court reasoned, "[A]n elder abuse claim involves reckless neglect (or intentional abuse) by the custodian of an elder. Thus, it is simply not encompassed within 'professional negligence.' Moreover, the legislative history of the Elder Abuse Act, as discussed in [other cases], indicates that it was intended to apply to acts of egregious abuse, while leaving acts of professional negligence not involving such egregious abuse to be dealt with under other law. Finally, [as emphasized in past authority] the purposes of the Elder Abuse Act were different from the purposes of MICRA." (*Smith, supra*, 133 Cal.App.4th at pp. 1522, 1520, 1524 [purpose of Elder Abuse Act is " 'to protect a particularly vulnerable portion of the population' " and the focus of the "pro-defendant" MICRA is to address the rising costs of medical malpractice insurance].)

In the case now before us, the trial court agreed with the Regents and the Medical Center that the patients had not met their burden of proving their alleged intentional torts were not merely an alternative theory of recovery based upon the same set of facts as a negligence cause of action "based on" professional negligence. The Regents and the Medical Center point to the patients' allegations in which they do not dispute that they were being treated "for a medical issue, that each underwent a medical procedure with her knowledge and consent, and that the alleged wrongful conduct was directly related to the procedures performed. Furthermore, [the patients] allege that the doctors owed them a fiduciary duty that arose from the professional relationship between doctor and patient to disclose what they were doing." (Italics omitted.)

Based on our review of the complaints, we conclude the patients' claims for fraud, conversion, and intentional infliction of emotional distress related to wrongful intentional conduct, not mere negligence. The allegations of stealing and then selling a person's genetic material for financial gain is an intentional act of egregious abuse against a particularly vulnerable and trusting victim. None of the patients assert the egg harvesting medical

procedures fell below the standard of care. Rather, it is the intentional and malicious quest to steal genetic material that is the focus of the lawsuit.

As noted above, the provisions of MICRA relating to statutes of limitations relate to the legislators' goal of reducing the number of medical malpractice actions filed. Section 340.5 provides, "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury . . . ." The legislators deliberately used the limiting term "professional negligence." It would be inconsistent with the letter and spirit of the statutory scheme to hold allegations of intentional fraud, emotional distress, and stealing are really just other forms of professional negligence. As discussed above, we have no reason to conclude the "Legislature intended to exempt intentional wrongdoers from liability by treating such conduct as though it had been nothing more than mere negligence." (*Perry, supra*, 88 Cal.App.4th at p. 669.) MICRA's statute of limitations would not apply to these intentional tort claims against the doctors directly, or against the Regents and the Medical Center based on a theory of vicarious liability or joint venture liability.

█ It is undisputed the patients all filed their lawsuits against the Regents within one year of being personally advised they were potential victims, but over five years after the scandal first hit the media, and over 10 years after they received fertility treatments. The patients amended their complaints to add the Medical Center within three years of being advised by an attorney their names were on the Ord list. In the next part of this opinion, we analyze whether the court could rule as a matter of law knowledge of wrongdoing should be imputed to the patients based on the media coverage. As will be discussed in depth anon, we conclude constructive suspicion based on publicity alone would be insufficient to trigger the statute of limitations. Consequently, the statute of limitations was triggered on the date the patients received letters from an attorney stating their names were on the Ord list.

Two intentional torts alleged in this case have three-year statutes of limitations, triggered upon discovery of the factual basis of the claim. (§ 338, subd. (d) [fraud]; § 338, subd. (c) [conversion].) These claims were timely made against both the Regents and the Medical Center.[4] The claims against

---

[4] The one exception to the above discussion is the Roules. Their original complaint against the Regents was filed in April 2000 and they did not amend it to add the Medical Center until January 2006. All of their claims against the Medical Center are time-barred. The Roules may only proceed with their claims against the Regents.

the Regents for intentional infliction of emotional distress were also timely (see former § 340, subd. (3) [one year]; see now § 335.1 [Stats. 2002, ch. 448, § 2, eff. Jan. 1, 2003] [two years]). However, because the Medical Center was not added to the complaints until three years after discovery of the factual basis for the intentional infliction of emotional distress claims, the demurrer was properly sustained as to the Medical Center.

■ As for the negligent supervision claim, the Regents and the Medical Center argue MICRA should apply. The MICRA statutory scheme "applies to two basic categories of health care providers: licensed practitioners and licensed facilities." It provides "(1) 'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with [s]ection 500) of the Business and Professions Code . . . ; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with [s]ection 1200) of the Health and Safety Code." (§ 340.5, subd. (1).)

On appeal, the patients assert the Regents and the owners of the Medical Center (American Medical International and then Tenet Healthcare) are simply business partners that financially backed the clinic and were not licensed heath care providers. They cite to cases that MICRA does not apply to nonlicensed entities or nonlicensed medical partnerships controlled by licensed physicians. (E.g., *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1419 [8 Cal.Rptr.3d 668].) However, the licensing status of these entities was not pled in the complaint. Therefore, we cannot say as a matter of law MICRA applies or does not apply. But this determination is not necessary because under either the MICRA statute of limitations, or the negligent supervision statute of limitations (see former § 340, subd. (3) [one year]; see now § 335.1 [Stats. 2002, ch. 448, § 2, eff. Jan. 1, 2003] [two years]), the patients' negligent supervision claims against the Regents were timely and the patients' claims against the Medical Center were not.

To summarize, all claims against the Regents survive. The fraud and conversion claims against the Medical Center also survive demurrer, but the intentional infliction of emotional distress and negligent supervision claims against the Medical Center were time-barred.[5]

---

[5] The patients assert they "do not intend to pursue the other claims asserted in their complaints." Accordingly, our discussion is therefore limited to the causes of action discussed on appeal: fraud, conversion, intentional infliction of emotional distress, and negligent supervision.

III

DISCOVERY OF THE HARM

### A. *Standard of Review on Demurrer*

When reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, an appellate court "must assume the truth of the complaint's properly pleaded or implied factual allegations." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) The court "must also consider judicially noticed matters" (*ibid.*), and the court may itself take judicial notice under Evidence Code sections 452 and 459. (*Sacramento Brewing Co. v. Desmond, Miller & Desmond* (1999) 75 Cal.App.4th 1082, 1085, fn. 3 [89 Cal.Rptr.2d 760].)

### B. *The Discovery Rule*

■ "The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' [Citation.] In other words, it sets the date as the time when the cause of action is complete with all of its elements [citations]—the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury' [citations]. [¶] An exception to the general rule for defining the accrual of a cause of action—indeed, the 'most important' one—is the discovery rule. [Citation.] It may be expressed by the Legislature or implied by the courts. [Citation.] It postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79] (*Norgart*).)

■ "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. [Citation.] He has reason to suspect when he has ' " ' "notice or information of circumstances to put a reasonable person *on inquiry*" ' " ' [citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but,

within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place—he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does [citation]." (*Norgart, supra*, 21 Cal.4th at pp. 397–398, fns. omitted.)

 Thus, the discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. "[W]e do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [27 Cal.Rptr.3d 661, 110 P.3d 914].)

C. *Applicable Cases—Can there be "constructive suspicion" of an injury?*

In *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202, 1206 [48 Cal.Rptr.3d 668] (*Nelson*), the court held there is no rule of "constructive suspicion," to trigger the statute of limitations simply when the dangers of a product are publicized. In *Nelson*, the plaintiff started using a prescription diet drug dexfenfluramine (called Redux, but commonly known as fen-phen) in January 1997. She used the diet pills for approximately one month. The drug was withdrawn from the market in September 1997, based on evidence linking it to valvular heart disease. (*Id.* at p. 1204.) In June 2002, the plaintiff saw an attorney's television advertisement about the fen-phen litigation. After an echocardiogram confirmed she had valvular heart disease, she contacted the attorney she had seen on television and filed a lawsuit. (*Ibid.*)

The *Nelson* case defendant, Indevus Pharmaceuticals, Inc. (Indevus), the company which promoted and marketed the fen-phen drug, filed a summary judgment motion arguing the action was barred by the statute of limitations based on its theory of " 'constructive suspicion.' " (*Nelson, supra*, 142 Cal.App.4th at p. 1204.) "Indevus's motion principally rested on its contention that under the discovery rule, the statute began to run when the danger of Fen-phen was publicized. That is, although it was undisputed for purposes of summary judgment that [plaintiff] did not know about the danger of fen-phen drugs before the spring of 2002, Indevus argues that she should have known sooner, when, through newspaper articles, television news reports, and other means, the public in general was given information sufficient to arouse suspicion, and that 'should have' is enough." (*Id.* at p. 1205, fns. omitted.)

The plaintiff testified in her deposition that before 2002, no doctor had suggested she get an echocardiogram and she never received notification the drug had been withdrawn from the marketplace. She claimed the attorney's television advertisement was the only one she had "seen concerning Fen-Phen use, lawsuits, or claims. Before she saw the ad, it had never occurred to her that she was at risk of having suffered an injury from diet drugs." (*Nelson, supra,* 142 Cal.App.4th at p. 1205, fn. 2.) Indevus offered evidence about the television and newspaper coverage which began in July 1997. After the drug was withdrawn, news reports cautioned patients to " 'call your doctor' to check for heart problems." (*Id.* at p. 1205.) In addition, letters were sent to 450,000 doctors and pharmacists informing them of the potential problems, and there were ads in newspapers informing patients of the drug's withdrawal. Moreover, Indevus offered evidence about the publicity surrounding the 1999 settlement of the federal court class action lawsuit against Wyeth, a company that also promoted and marketed the drug. The trial court agreed with Indevus and entered summary judgment.

The appellate court in *Nelson* reversed the judgment. It rejected Indevus's argument that under California law, constructive suspicion is good enough. The court reasoned, "Our Supreme Court has never held that under the discovery rule, the suspicion necessary to trigger the statute may be imputed to a plaintiff, and we do not believe that to be the law. When the cases are read in whole, rather than in isolated quotes, it is clear that a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate. . . . [¶] The statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only '[o]nce the plaintiff *has* a suspicion of wrongdoing.' [Citation.]" (*Nelson, supra,* 142 Cal.App.4th at p. 1206.)

The *Nelson* court analyzed how Indevus had "distort[ed] the holding[s]" of the cases it relied on such as *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923] (*Jolly*) and *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93 [132 Cal.Rptr. 657, 553 P.2d 1129]. (*Nelson, supra,* 142 Cal.App.4th at p. 1206.) It concluded, "Indevus's argument amounts to a contention that, having taken a prescription drug, [plaintiff] had an obligation to read newspapers and watch television news and otherwise seek out news of dangerous side effects not disclosed by the prescribing doctor, or indeed by the drug manufacturer, and that if she failed in this obligation, she could lose her right to sue. We see no such obligation. Instead, 'If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an

investigation.' [Citation.] A patient who *actually* learns of the dangerous side effects of a drug she has taken ignores her knowledge at her peril, but the law only requires an investigation when a plaintiff has a reason to investigate." (*Nelson, supra*, 142 Cal.App.4th at p. 1208.)

One of the cases discussed by the *Nelson* court happens to be the same case the trial court relied upon as supporting its ruling sustaining the Regents' and the Medical Center's demurrers. *McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151 [86 Cal.Rptr.2d 645] (*McKelvey*), superseded by statute on a different point in *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637, footnote 8 [54 Cal.Rptr.3d 735, 151 P.3d 1151] involved class actions (one brought in 1997 and one brought in 1998) against an aircraft manufacturer, alleging the plaintiffs were injured after being exposed to contaminated soil and groundwater. Boeing's statute of limitation demurrers were sustained in both actions, and in a consolidated appeal the court affirmed the rulings.

In both actions, Boeing argued the pleadings, on their face, were insufficient to show delayed discovery. In addition, it "asked the court to judicially notice 117 documents—copies of newspaper articles, transcripts of radio and television broadcasts, and government 'fact sheets' describing and discussing the contamination at the Rocketdyne facilities. Boeing's position was and is that [plaintiffs] knew or, as a matter of law, could (with the exercise of reasonable diligence) have earlier discovered the facts essential to their causes of action." (*McKelvey, supra*, 74 Cal.App.4th at p. 157.) This second argument is essentially the same "constructive suspicion" argument made and rejected in *Nelson.* The trial judge granted Boeing's requests for judicial notice in the 1997 case, but a different judge was assigned to the 1998 class action and denied Boeing's judicial notice request. (*Id.* at pp. 159, 162.)

The *McKelvey* court begins its discussion by stating the allegations in the complaints were insufficient to invoke the delayed discovery rule. It determined, "None of the complaints (not the proposed second amended complaints in [one class action] or the third amended complaints filed [in the other class actions]) are sufficient because none of them disclose the time or manner of discovery by any plaintiff. They offer only conclusory allegations of Boeing's 'massive cover-up,' and allegations that plaintiffs discovered that they 'may have sustained injuries' as a result of Boeing's wrongs 'less than one year prior to filing the instant action against [Boeing].' . . . They do not allege that they were not aware of facts sufficient to make a reasonably prudent person sufficiently suspicious to investigate further. [Citation.] In light of the facts they *do* allege, these omissions are fatal." (*McKelvey, supra*, 74 Cal.App.4th at pp. 160–161, fn. omitted.)

The court found significant that the plaintiffs in *McKelvey* "admitted in their first and subsequently amended complaints that 'public notices and newspaper articles were published about [Boeing's] intentional, reckless[,] and/or negligent conduct.' In the face of that admission, plaintiffs' conclusory assertion that they 'were and are not [*sic*] aware of the actual and potential harm caused by [Boeing's] conduct' is patently inadequate. Without resort to the matters submitted to the court for judicial notice, the bottom line is that plaintiffs' amended (and proposed amended) complaints acknowledge the publicity surrounding Boeing's operation of the Rocketdyne facilities, yet nevertheless fail to explain how they managed to ignore those 'newspaper articles.' . . . [T]hey have not alleged *facts* about the time or manner of discovery; they have not alleged *facts* showing their inability to have made an earlier discovery despite reasonable diligence. [Citations.] *They do not allege that they did not read, hear or see the articles and broadcasts they admit were published.*" (*McKelvey, supra*, 74 Cal.App.4th at p. 161.)

The last issue addressed by the *McKelvey* court concerned judicial notice. (*McKelvey, supra*, 74 Cal.App.4th at p. 162.) Boeing argued the trial court improperly denied its requests for judicial notice in 1998, and the plaintiffs argued the judge in 1997 "improperly took judicial notice of the 'truth' of 'a disputed issue of fact—the time and manner each [p]laintiff discovered his . . . cause of action.' " (*Ibid.*) The appellate court stated, "*Although the issue is moot* in light of our conclusion in part I, *ante,* [regarding the inadequate complaints], we do note for the record that, assuming the propriety of judicial notice of newspaper articles, *the truth of the facts reported is irrelevant.* The 117 documents . . . were offered to show the extent of the widespread publicity about the problems . . . . They were offered to show that, at a time outside the statute of limitations, plaintiffs had notice of or information of circumstances sufficient to put a reasonable person on inquiry. They were offered to show that anyone living in Los Angeles County, and certainly anyone living or working in the vicinity of the Rocketdyne facilities, would have read or heard about the contamination at and around the Rocketdyne facilities. *The accuracy of the reporting is irrelevant.*" (*McKelvey, supra*, 74 Cal.App.4th at p. 162, fn. omitted, italics added.)

In a corresponding footnote, the court clarified, "Since plaintiffs did not dispute the accuracy of the relevant facts—that is, that the articles were published, that the shows were broadcast, and that the 'fact sheets' were distributed—there is no reason the matter could not have been resolved by demurrer. We mention this only because the parties spent so much time and effort in their briefing, and emphasize that the point is moot." (*McKelvey, supra*, 74 Cal.App.4th at p. 162, fn. 13.) Consequently, the court's one-paragraph discussion on judicial notice must be read in context of the facts of that case, i.e., the plaintiffs admitted knowledge of the publicity in their

pleadings. The court, recognizing the issue was moot, assumed the media reports were subject to judicial notice, and determined accuracy of the reports was irrelevant.

The *Nelson* court commented the *McKelvey* case "include[d] a good deal of discussion about the publicity." (*Nelson, supra*, 142 Cal.App.4th at p. 1210.) However, it noted that court's affirmance was not based on a theory of imputed knowledge, but rather based on the fact the plaintiffs' complaint contained admissions the plaintiffs knew of the widespread publicity, yet they failed to explain how they managed to not read, hear, or see those articles and broadcasts. (*Ibid.*) We agree with this analysis of *McKelvey*.

It is interesting to note that following the *McKelvey* case, the Legislature enacted section 340.8 (regarding civil actions for injury based on exposure to a hazardous material or a toxic substance). Subdivision (c)(2) of section 340.8, specifically states, "Media reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another." The section's historical notes indicates it was the Legislature's intent to codify the delayed discovery ruling found in cases like *Norgart, supra*, 21 Cal.4th at pages 397–398 and *Jolly, supra*, 44 Cal.3d 1103, "and to disapprove the ruling [in] McKelvey . . . ." (Historical and Statutory Notes, 13C West's Ann. Code Civ. Proc. (2006 ed.) foll. § 340.8, p. 248.) In *Nelson,* the court held this statute (§ 340.8) applies to actions involving personal injury caused by harmful chemicals such as fen-phen. (*Nelson, supra*, 142 Cal.App.4th at p. 1209.)

The Regents maintain *McKelvey* is still good law because in cases of mass contamination (whether environmental or by a widely used drug) a person aware of the publicity would not necessarily have a reason to suspect they have been injured by it. They point out the plaintiff in *Nelson* could not immediately link her medical ailments to a diet pill. Moreover, the media coverage in that case did not list the specific symptoms of valvular heart injury.

We agree the media coverage of the UCI scandal is different because the patients' injuries were not caused by a particular substance, but rather by intentional wrongdoing. Yet, this is a distinction that makes no difference for purposes of this appeal. The *McKelvey* court held the complaints inadequately pled facts to establish delayed discovery because the plaintiffs failed to disclose the time and manner of discovery after admitting knowledge of media coverage. The court did not hold knowledge could be imputed from

the newspaper reports and broadcasts. Moreover, it did not decide the overall propriety of judicial notice of newspaper articles. (*McKelvey, supra*, 74 Cal.App.4th at p. 162.)

■ We conclude neither *Nelson* nor *McKelvey* provides authority to support the court's ruling that public awareness of a problem through media coverage alone creates constructive suspicion for purposes of discovery. "The statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only '[o]nce the plaintiff *has* a suspicion of wrongdoing.' [Citation.]" (*Nelson, supra*, 142 Cal.App.4th at p. 1206.)

### D. *Judicial notice of an interpretation of the media reports was improper.*

At the Regents' request, the trial court took judicial notice of 100 articles and press releases concerning the Fertility Clinic's problems. It ruled, "[T]he *McKelvey* case is controlling in these actions and all of the [patients] must allege and prove that in spite of the widespread and pervasive nature of the media coverage of the scandal, which placed them on inquiry notice of the potential for wrongdoing in their respective cases, why discovery of the wrongdoing was delayed. The media coverage was pervasive, was statewide, and was national in certain instances. There were at least seven public investigations ongoing, including those by the California State Senate and the UCI police. Numerous lawsuits were filed by other patients." The trial court ruled the Regents' requests to take judicial notice "are proper and are granted as they have been in all instances in the past." We disagree.

■ " 'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.' [Citation.]" (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 [110 Cal.Rptr.2d 877] (*Lockley*).) " 'Judicial notice may not be taken of any matter unless authorized or required by law.' (Evid. Code, § 450.) Matters that are subject to judicial notice are listed in Evidence Code sections 451 and 452. A matter ordinarily is subject to judicial notice only if the matter is reasonably beyond dispute. [Citation.] Although the *existence* of a document may be judicially noticeable, the truth of statements contained in the document and its *proper interpretation are not subject to judicial notice* if those matters are reasonably disputable. [Citation.]" (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113 [55 Cal.Rptr.3d 621], second italics added (*Fremont*).)

■ " 'In ruling on a demurrer, a court may consider facts of which it has taken judicial notice. (. . . § 430.30, subd. (a).) This includes the existence of

a document. When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable. [Citation.]' [Citation.]" (*Fremont, supra*, 148 Cal.App.4th at p. 113.) Moreover, " 'Taking judicial notice of a document is not the same as accepting the truth of its contents or accepting a particular interpretation of its meaning. [Citation.] On a demurrer a court's function is limited to testing the legal sufficiency of the complaint. [Citation.] "A demurrer is simply not the appropriate procedure for determining the truth of disputed facts." [Citation.] The hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable. [Citation.]' . . . ' "[J]udicial notice of matters upon demurrer will be dispositive only in those instances where there is not or cannot be a factual dispute concerning that which is sought to be judicially noticed." [Citation.]' " (*Id.* at pp. 113–114.)

Here, the court did not take judicial notice of undisputed facts written in the newspaper articles. Rather, the court interpreted the widespread media coverage to conclusively refute the patients' allegations they either (1) did not see or read the media coverage, or (2) saw the publicity, but failed to discover any wrongdoing. We will address each group of patients separately, finding judicial notice was improperly taken in both instances.

Patients (1) Shirel and Steve Crawford, (2) Rosalinda and Layne Elison, and (3) Julie Kirk all pled they had no knowledge of the media reports or the publicity surrounding the scandal. Specifically, the Crawfords alleged they returned to their home in San Diego after undergoing a diagnostic procedure at the Fertility Clinic. They pled: "Since plaintiffs lived in San Diego, California, they did not hear or read about any media coverage in 1995 concerning the scandal about [the doctors] when it was reported in Orange County. Their first awareness that they may have been victimized was in November of 2002, when they were contacted by a [lawyer] who apprised them of the scandal and the possibility that they may have had their eggs stolen . . . ." Similarly, the Elisons and Kirk pled that before receiving a letter in November 2002, they were not aware of "any information suggesting that [they were] victim[s]" and they "did not see and were unaware of any local media reports of alleged misuse of eggs or embryos obtained from [the doctors' patients]."

As stated above, a hearing on demurrer cannot be turned into a contested evidentiary hearing. Because constructive suspicion is not enough to trigger the statute of limitations, the fact the scandal was publicized is irrelevant unless the plaintiff admits to having knowledge of the publicity. There is no evidence these plaintiffs in earlier pleadings made statements that were

inconsistent with their claim to being unaware of the publicity. (Cf. *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383–384 [243 Cal.Rptr. 627] [if plaintiff fails to explain the inconsistency, the earlier admissions will be "read into" the pleading before the court, and the latter inconsistent allegations will be disregarded].) Since knowledge of widespread media coverage cannot be imputed to these plaintiffs, the media publicity is irrelevant. Any dispute as to whether these plaintiffs are telling the truth cannot be resolved at this early stage of the proceedings. Judicial notice of this interpretation of the media coverage was improper.

The *McKelvey* case is not on point. The *McKelvey* court only briefly discussed the propriety of taking judicial notice of media reports, and it focused on whether the accuracy of the reporting was relevant. (*McKelvey, supra*, 74 Cal.App.4th at p. 162.) Because the plaintiffs had *already admitted knowledge* of the media reports in their complaints, the court held judicial notice of them may be proper for the limited purpose of proving the extent of the widespread publicity. As explained above, the court ultimately decided the conclusory allegations regarding delayed discovery were "patently inadequate" in light of the plaintiffs' admissions they knew of the publicity. The appellate court's decision was made "[w]ithout resort to the matters submitted to the court for judicial notice." (*Id.* at p. 161.) The *McKelvey* court never suggested knowledge of widespread publicity could be imputed to an individual plaintiff (especially one who claimed to be unaware of the publicity). The case simply does not support the novel legal theory a court evaluating a demurrer may take judicial notice of "constructive suspicion" due to media coverage.

The remaining patients (the Cachus, Durants, Roules, Ruhls, and Unruh-Haxtons) admit they were aware of the media coverage, but gave reasons why their discovery of wrongdoing was nevertheless delayed. Unlike the plaintiffs in *McKelvey*, these plaintiffs alleged in detail the time and manner of their discovery and how they acted with reasonable diligence: (1) their names were never mentioned in the newspaper articles; (2) the Regents possessed all the medical records and publicly promised to notify all potential victims but did not notify these plaintiffs; (3) the doctors and the Fertility Center continually gave false representations regarding the safety of the patients' genetic material; (4) it was later learned the Regents attempted to conceal facts from the patients; and (5) three sets of patients (the Durants, Roules and Unruh-Haxtons) had had contact with the Regents and were led to believe they were not victims.[6]

---

[6] For example, the Roules were first assured by the doctors their eggs were safe, and then later notified by the Regents that their genetic material was being transferred to a different facility for storage. In 1996, the Roules obtained their medical records, but the Regents withheld the portions that would have caused the couple to suspect wrongdoing. Based on

Whether these patients were justified in relying on the doctors' and the Regents' representations cannot be decided at this time as a matter of law. Publicity may arouse suspicion of wrongdoing, but alone it cannot supply the factual basis for a claim because not every patient at the Fertility Clinic was a victim. Moreover, the first newspaper articles reported only one or two patients were affected. In the following months, UCI issued a press release increasing the number of victims to 30 or 35, and much later increased the number to being over 300. At all times, the Regents publicly gave assurances they were going to great lengths to contact the potential victims, and had even hired a private investigator to help them find everyone. We cannot hold as a matter of law what part, if any, of the media reports these patients saw or that it was unreasonable for them to rely on the Regents' representations.

As aptly noted by some of the patients, their attempts to investigate the matter were thwarted by the Regents with incomplete medical records and reassuring telephone calls. The complaints allege the Regents had exclusive access to and possession of the Ord list. "[W]hen the defendant is guilty of fraudulent concealment of the cause of action the statute [of limitations] is deemed not to become operative until the aggrieved party discovers the existence of the cause of action." (*Pashley v. Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 229 [153 P.2d 325].) The court could not rely on judicial notice of the media reports to support an inference these patients had knowledge of their injury because "such matters are reasonably subject to dispute and therefore require formal proof. [Citation.]" (*Lockley, supra*, 91 Cal.App.4th at p. 882.) At this juncture, we must conclude the allegations in the complaint were sufficient to support the patients' claims of delayed discovery.

IV

SCOPE OF EMPLOYMENT

"Under the doctrine of respondeat superior, an innocent employer may be liable for the torts its employee commits while acting within the scope of his employment. This liability is based *not on* the employer's fault, but on public policies concerning who should bear the risk of harm created by the employer's enterprise. It is considered unjust, for example, for an employer to disclaim responsibility for injuries occurring in the course of its characteristic activities. [Citation.] Moreover, losses caused by employees' torts are viewed as a required cost of doing business, the risk of which an

---

the records they had, an attorney advised them there was no reason to suspect they were victims. Similarly, the Unruh-Haxtons and Durants made telephone contact with the Regents' representative, and these patients claim they were led to believe they had not been victimized.

employer may spread through insurance. [Citation.]" (*Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 481 [130 Cal.Rptr.2d 706], italics added (*Yamaguchi*).)

 "In light of this purpose, the determining factor in ascertaining whether an employee's act falls within the scope of his employment for respondeat superior liability is not whether the act was authorized by the employer, benefited the employer, or was performed specifically for the purpose of fulfilling the employee's job responsibilities. [Citation.] Rather, the question is whether the risk of such an act is typical of or broadly incidental to the employer's enterprise. [Citation.] [¶] An employer may therefore be vicariously liable for the employee's tort—even if it was malicious, willful, or criminal—if the employee's act was an 'outgrowth' of his employment, ' " 'inherent in the working environment,' " ' ' " 'typical of or broadly incidental to' " ' the employer's business, or, in a general way, foreseeable from his duties. [Citation.] By contrast, an employer will *not* be held liable under the respondeat superior doctrine for conduct that occurs when the employee 'substantially deviates from the employment duties for personal purposes' or acts out of personal malice unconnected with the employment, or where the conduct is ' "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." ' [Citations.]" (*Yamaguchi, supra*, 106 Cal.App.4th at pp. 481–482.)

 " 'Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when "the facts are undisputed and no conflicting inferences are possible." ' [Citation.]" (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1019 [47 Cal.Rptr.2d 478, 906 P.2d 440], fn. omitted.) "In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment. [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 213 [285 Cal.Rptr. 99, 814 P.2d 1341].)

The Regents assert the doctors were providing medical services when the wrongful conduct allegedly occurred, making the action one for professional negligence (and MICRA), but because the doctors "went outside their agreed employment" when they misappropriated genetic material they were not acting within the scope of their employment. The patients assert the issue cannot be decided as a matter of law. They explain the doctors were authorized to harvest and fertilize eggs, freeze, and store them for subsequent use, implant them in patients and use them for research as part of their employment. The wrongful acts arose in conjunction with, and while the doctors were providing, these medical services.

A few years ago, a different panel at this court decided in *Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736 [92 Cal.Rptr.2d 94] (*Stone*), that the Regents did not have to provide a defense to Sergio Stone (who was a partner of the doctors Asch and Balmaceda) at the Fertility Clinic. In that case, former patients, Susan and Wayne Clay, sued Stone and others alleging eggs, sperm, and embryos were implanted in another woman without the Clays' knowledge or consent. At the time, the Regents were still investigating the charges, and the doctors at the Fertility Clinic, including Stone, were not cooperating. "They refused to provide patient charts, embryology records, or information about procedures for obtaining patient consents, and they declined to allow the panel to interview patients—even in their presence—to look into the question of consent." (*Id.* at p. 740.)

The Regents refused to defend Stone, taking the position Stone's conduct was intentional and fraudulent and therefore outside the scope of employment. The Regents stated there was an actual conflict of interest between Stone and the university, "because the physician failed to give the university requested medical records which the University, as a provider of care to the Clays and others, had a right to possess." (*Stone, supra,* 77 Cal.App.4th at p. 742.) Stone petitioned for a writ of ordinary mandate under section 1085 and prevailed.

This court reversed the ruling, holding, "Scope of employment is a question of fact, but all that can be required of the Regents when asked for a defense under the statutory scheme is that their decision be within the range of reason. It was. *We cannot say as a matter of law* it is typical of the risks of a medical school faculty practice that a physician, for 18 years a tenured professor, with a renowned and successful fertility clinic, would be part of a scheme to enrich himself by using a patient's eggs without her consent. Put in terms of the foreseeability test, this *is* such startling and unusual conduct that we cannot say, as a matter of law, it would be fair to impose these risks on a university. To the extent the conduct may be viewed as an abuse of job-created authority, it was again a reasonable conclusion the motivations were the purely personal ones of financial reward and professional acclaim." (*Stone, supra,* 77 Cal.App.4th at p. 748, fn. omitted, first italics added.)

In short, we decided in *Stone* the scope of employment could not be determined as a matter of law, but that under the test required for the statutory scheme at issue the Regents had not abused their discretion in denying Stone a defense. In a footnote we noted, "The Regents' call that Stone's conduct was outside the scope of employment was not the last word, of course. Under [the applicable statutory scheme], Stone could pay for his own defense and then recover from the Regents by establishing that the Clays' suit

*did* arise out of actions taken within the scope of his university employment." (*Stone, supra*, 77 Cal.App.4th at p. 748, fn. 10.)

In the case now before us, we are limited to the facts alleged in the complaint and we must assume the truth of those allegations. The patients maintain their injuries arose following fertility treatments performed by the doctors employed by the Regents to perform fertility treatments. At this stage of the litigation, we are unable to determine whether the wrongful conduct was "foreseeable" or an "outgrowth" or "typical" in the fertility treatment business. (*Yamaguchi, supra*, 106 Cal.App.4th at pp. 481–482.) We cannot say as a matter of law the doctors' work and their wrongful conduct was so attenuated that a jury could not reasonably conclude the acts were unforeseeable or outside the scope of employment.

V

Joint Venture Liability

The Regents and the Medical Center assert the court properly found insufficient allegations to support a finding the parties were in a joint venture. They maintain the patients failed to plead the Regents or the Medical Center, as members of the joint venture, had control over the business enterprise. For example, the Regents argue, "Plaintiffs have not alleged that anything in the agreement gave the Regents any say in how the doctors would run the clinic, what research they would do, what patients they would treat, etc. The control belonged solely to the doctors, with the Regents providing financing in exchange for a return on its investment."

"A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." (*Nelson v. Abraham* (1947) 29 Cal.2d 745, 749 [177 P.2d 931].) "There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise. [Citation.]" (*Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666 [60 Cal.Rptr.2d 179] (*Orosco*).) "Whether a joint venture actually exists depends on the intention of the parties. [Citations.] [¶] . . . [¶] . . . [W]here evidence is in dispute the existence or nonexistence of a joint venture is a question of fact to be determined by the jury. [Citation.]" (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 819–820 [195 Cal.Rptr. 421].)

Here, it cannot be held as a matter of law that the complaints fail to allege facts supporting creation of a joint venture. The complaint pleads, and

defendants concede, two elements: There was an agreement for them to finance the Fertility Clinic and they expected a profit in return for their respective ownership interests. The requisite joint control is supplied by the complaints' allegations the doctors, the Regents and the Medical Center "entered into a written joint venture agreement. The joint venture then operated the clinic . . . . The joint venture included the operation and management of the [Medical Center] Garden Grove building itself." Certainly, a written joint venture agreement strongly indicates an intention to enter into a joint venture. The allocation of responsibilities in operating the business does not necessarily change the character of the joint venture relationship. One having the right to control a business is permitted to delegate responsibilities. (See *Orosco, supra*, 51 Cal.App.4th at p. 1666.) Whether the wrongful acts of one joint venturer were committed in connection with the joint venture, or can be imputed to the other joint venturers are questions for another day because the scope of review on demurrer is limited. We conclude the complaints alleged facts sufficient to support a cause of action under a joint venture theory of liability.

VI

PATIENTS' REQUEST FOR LEAVE TO AMEND THEIR COMPLAINTS

The patients seek leave to amend their complaints to plead a violation of the state constitutional right to privacy. They allege the complaints already contain facts to support this cause of action. In addition, one set of patients, the Durants, request leave from this court to amend their complaint to correct errors and omissions of several facts. They cite as supporting authority *Smith v. Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 627 [223 Cal.Rptr. 339], where the trial court sustained without leave to amend a demurrer to a third amended complaint. On appeal, the plaintiff suggested the facts alleged in his complaint revealed a cause of action for slander of title, a claim not alleged in the complaint. The defendant objected, arguing new theories may not be raised for the first time on appeal. The court acknowledged this general rule, but held "in the pleading stage these considerations are inapplicable, and on appeal from a demurrer we search the facts to see if they make out a claim for relief under *any* theory. [Citation.]" (*Id.* at pp. 629–630.) But because we have determined the pleadings, in their current state, are not defective, it is not necessary for us to consider whether additional claims could be pled on the facts raised to defeat the demurrers. Whether the pleadings can or should be amended is for the trial court to decide on remand.

## VII

### Disposition

The statute of limitations does not bar any of the patients' claims against the Regents. All of the Roules' claims against the Medical Center are barred. All of the patients' claims for intentional infliction of emotional distress and negligent supervision against the Medical Center are barred. All other claims against the Medical Center survive. Accordingly, the judgment is reversed in part and affirmed in part. The appellants shall recover their costs on appeal against the Regents only. The respondents, the Medical Center (Garden Grove Hospital and Medical Center, and Tenet Healthcare Corporation), shall bear their own costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

On May 15, 2008, the opinion was modified to read as printed above.