SIMONS, J.
After defendant and respondent T. Peter Thomas ("Thomas"), a member of the Board of Directors of plaintiff and appellant Applied Medical Corporation ("Applied"), was removed from the Board, Applied exercised its right to repurchase shares of its stock issued to Thomas as part of certain stock incentive plans.
*172 Thomas objected to the repurchase price, and in August 2012 Applied filed the instant lawsuit. In June, 2015, the trial court granted summary judgment against Applied, which timely appealed. We affirm as to Applied's fraud-based claims, but reverse as to Applied's claims based on breach of contract and conversion. In the published portion of this opinion we address two issues. First, the trial court erred in determining Applied's conversion claim failed. We conclude such a claim may be based on either ownership or the right to possession at the time of conversion. Second, we conclude the trial court correctly ruled Applied's fraud claims were barred by the applicable statute of limitations. We reject Applied's argument that those claims, first alleged in 2014, were timely under either the discovery rule or the relation back doctrine.
FACTUAL AND PROCEDURAL BACKGROUND [1]
Applied is a provider of specialty medical products for surgical and minimally invasive procedures. Defendants and respondents Reid W. Dennis ("Dennis") and Thomas are general partners of Institutional Venture Management IV, L. P. ("IVM"). IVM is the general partner of defendant and respondent Institutional Venture Partners IV, L.P. ("IVP"), a venture-capital investment limited partnership. From 1988 to 1992, IVP made substantial financial investments in Applied. In 1988, Thomas joined Applied's Board of Directors ("Board").
In 1998 the Board approved Applied's 1998 Stock Incentive Plan (the "1998 Plan") regarding stock option awards. In 2003, the Board approved a stock option program proposed by Thomas for individuals serving as outside directors on the Board. Between 2003 and 2008, Thomas received five stock option grants pursuant to the 1998 Plan, and between 2009 and 2010, he received two stock option grants pursuant to Applied's Amended and Restated 2008 Stock Incentive Plan (the "2008 Plan").
The 1998 Plan included a provision giving Applied the unilateral right to repurchase shares upon termination of a director's service. The agreements corresponding to Thomas's grants under the 1998 Plan stated Applied would "have the right (but not the obligation) to repurchase ... any or all of the Shares acquired pursuant to the exercise" of the stock option upon termination of the optionee's service. Thomas acknowledged he, upon exercise of the repurchase right, "shall be obligated to sell his ... Shares to the Company." Thomas also represented the options were "being acquired ... for [his] personal account, for investment purposes only, and not with a view to the distribution, resale or other disposition thereof."
The 2008 Plan also gave Applied the right to repurchase shares from Thomas, and, in accepting stock option grants under the 2008 Plan, Thomas again acknowledged his obligation to sell his shares to Applied upon exercise of the company's repurchase right. Thomas also represented any shares would be acquired with his "own funds for investment for an indefinite period for your account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof," and that he had no "contract, understanding or *173 agreement with any person to sell, transfer, or grant participation" to his options.
The IVM partners had an oral agreement regarding stock options obtained due to a partner's service on the board of directors of a company in which IVP had invested, like Applied. Under that agreement, the IVM partners provide the funds to purchase stock and, when the stock is sold, the proceeds are shared among the partners.[2]
According to Applied, Thomas did not disclose the stock-sharing agreement. Applied CEO Said Hilal ("Hilal") learned of the possibility that Thomas would share stock proceeds for the first time shortly before a Board meeting on or around February 24, 2011.[3] Thomas said he "might share" the proceeds of the stock options awarded to him with his partners at IVP. Hilal was "surprised" by Thomas's suggestion because he considered it "completely contrary to the reason that the Company adopted a stock option program for directors in the first place-to compensate directors for their individual service." Thomas told Hilal he had "misunderstood;" Thomas said he was only "thinking about sharing his stock options" and he had not actually decided to do so. Thomas averred in his declaration that he "voluntarily disclosed the proceeds-sharing arrangement" to Hilal at the February 2011 Board meeting.
Applied raised concerns about the stock-sharing agreement in a December 1, 2011 e-mail from Applied's general counsel to Thomas. He wrote, "Said [Hilal] mentioned a discussion during the Applied Board meeting in February [2011], regarding the Applied stock options granted to you over the years. Our understanding is that you have an arrangement with IVP by which your Applied stock options are shared with your partners. You will recall that Said was surprised to learn of the arrangement, which was not known to Applied or the board. We believe the arrangement is inconsistent with the purpose of Applied's outside Director option program-to provide a form of compensation and incentive to the directors-for their service as directors. During that discussion with Said, you agreed to the cancellation of the options." Thomas replied that same day, stating *174 "The stock options that I've earned over the years are not inconsistent with what your purpose [is.] It is to reward me. I own the shares and the shares are never going to be in any name but my name. Whether I share some of the proceeds of the sale in the future is my business and my sharing of the information with Said that I would probably share the benefits is for information only. I have no intention of ever putting any of those shares in the name of anybody but me. [¶] I also NEVER told Said that it was okay to cancel any of my shares and definitely am not willing to have those shares cancelled."
In January 2012, Thomas was voted off the Applied Board, apparently due to an alleged conflict of interest relating to IVP's efforts to compel Applied into an initial public offering in mid-2011.
On February 1, 2012, Thomas exercised his stock options and purchased 37,950 shares of Applied stock. On February 16, Applied confirmed the purchase and issued a stock certificate in Thomas's name. At the same time, Applied notified Thomas it was exercising its rights under the stock-option agreements to repurchase the shares. Applied stated the "Fair Market Value" of the shares was $13.05 each, and the company made available a check in the amount of $495,247.50. The 1998 and 2008 Plans set the repurchase price as the "Fair Market Value" of the shares, as determined "in good faith" by the Applied Board's Compensation Committee. Both plans state the determination "shall be conclusive and binding." The $13.05 purchase price for Thomas's shares was based on a valuation from a third-party firm that had performed valuations of Applied's stock since 2004.
On March 6, 2012, an attorney for IVP responded on behalf of Thomas to Applied's repurchase notification. The letter stated that Thomas "disputes Applied's fair market value determination of $13.05," explaining the amount was far less than a binding third party offer for the stock and a third party valuation obtained by IVP. The letter requested that Applied "either rescind [the] offer to repurchase Mr. Thomas' option shares and deliver the shares to him, or, in light of the third party offer received by Mr. Thomas and the independent valuations outlined above, make an offer at a price reflecting an actual good faith fair market value."
Outside counsel for Applied responded by letter on April 20, 2012, stating, among other things, that the stock option agreements "contemplate that fair market value is determined through Applied's usual valuation process." The letter enclosed a check for $495,247.50 and warned that if Thomas did not return his "duly executed stock powers by April 27," Applied would consider him "to be in breach of his obligations under the stock option agreements." Applied's general counsel wrote to Thomas's counsel on June 27 warning that Thomas "remains in breach of his obligations" under the stock option agreements.
Applied filed the present lawsuit against Thomas and IVP on August 31, 2012. Applied asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, aiding and abetting conversion, and declaratory relief. Broadly speaking, the claims were based on Thomas's alleged refusal to transfer his shares to Applied after the company exercised its repurchase rights.
On or about September 6, 2012, Thomas cashed Applied's check for $495,247.50 and deposited the proceeds into his personal checking account. On September 10, an attorney for Thomas sent Applied an executed stock-assignment form for Thomas's 37,950 shares, signed by Thomas on September *175 5, while reserving the right to continue to dispute the valuation.
On June 24, 2014, Applied moved for leave to file a Second Amended Complaint ("SAC"). The SAC was filed on August 15. The claims in the SAC, the operative complaint in the present case, are as follows: breach of contract (first cause of action; against Thomas); breach of the implied covenant of good faith and fair dealing (second cause of action; against Thomas);[4] conversion (third cause of action; against Thomas and IVP); aiding and abetting conversion (fourth cause of action; against IVP); fraudulent concealment (fifth cause of action; against Thomas and IVP); aiding and abetting fraudulent concealment (sixth cause of action; against Dennis); breach of fiduciary duty (seventh cause of action; against Thomas); and declaratory relief (eighth cause of action; against Thomas). Broadly speaking, the fraud-based claims are based on Thomas's failure to disclose the stock-sharing agreement.
In December 2014, respondents filed a motion for summary judgment or, in the alternative, summary adjudication. In April 2015, Applied moved for leave to file a Third Amended Complaint ("TAC") adding, among other things, new theories of liability based on the language of an IVM partnership agreement obtained in discovery. The trial court continued the hearing on the motion for leave to file the TAC until after the hearing on the motion for summary judgment.
On June 5, 2015, the trial court granted respondents' motion for summary judgment. The motion for leave to file the TAC was denied "in light of" the ruling on the summary judgment motion. This appeal followed.
DISCUSSION
The trial court granted summary judgment to respondents on all of Applied's causes of action. We conclude the court erred as to the breach of contract, conversion, and aiding and abetting conversion causes of action, but the court properly granted summary judgment as to Applied's fraud-based causes of action (fraudulent concealment, aiding and abetting fraudulent concealment, and breach of fiduciary duty) on statute of limitations grounds.[5]
"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c) ; see also id. , § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish, a prima facie case....' [Citation.] On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (Miller, supra , 36 Cal.4th at p. 460, 30 Cal.Rptr.3d 797, 115 P.3d 77.) "We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of *176 the party opposing the motion in accordance with the applicable standard of proof.' " (King v. United Parcel Service, Inc. (2007) 152 Cal.App.4th 426, 433, 60 Cal.Rptr.3d 359.)
I. Applied's Breach of Contract Claim**
II. Applied's Conversion Claims
Applied's claims for conversion (third cause of action) and aiding and abetting conversion (fourth cause of action) are based on Thomas's alleged conversion of 37,950 shares of stock that Thomas failed to transfer to Applied upon the company's exercise of its repurchase right. The trial court granted summary judgment on Applied's conversion claims, concluding Applied suffered no cognizable harm and Applied "cannot prove that it owned or actually possessed the property at issue at the time of the alleged conversion." The court erred.
As to the first ground, the trial court erred in concluding Applied could not show damages for the reasons stated previously with respect to Applied's contract claim. (See also Virtanen v. O'Connell (2006) 140 Cal.App.4th 688, 708, 44 Cal.Rptr.3d 702 [" 'the normal measure of damages for conversion' " includes " 'fair compensation for the time and money properly expended in pursuit of the property' (Civ. Code, § 3336 )"].)
As to the second ground, " ' " 'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.' " ' " (Lee v. Hanley (2015) 61 Cal.4th 1225, 1240, 191 Cal.Rptr.3d 536, 354 P.3d 334.) "Neither legal title nor absolute ownership of the property is necessary. [Citation.] A party need only allege it is 'entitled to immediate possession at the time of conversion .' " (Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 452, 61 Cal.Rptr.2d 707 (Farmers ); accord Plummer v. Day/Eisenberg, LLP (2010) 184 Cal.App.4th 38, 45, 108 Cal.Rptr.3d 455 ; see also PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP (2007) 150 Cal.App.4th 384, 395, 58 Cal.Rptr.3d 516 (PCO, Inc. ) ["The tort of conversion is derived from the common law action of trover. The gravamen of the tort is the defendant's hostile act of dominion or control over a specific chattel to which the plaintiff has the right of immediate possession."].)
The trial court concluded Applied's conversion claim failed because Thomas had possession and title to the shares at the time of Applied's exercise of its repurchase rights and, therefore, Applied could not show it owned or actually possessed the shares. For the proposition that Applied had to show ownership or possession, the court relied on language in Rutherford Holdings, LLC v. Plaza Del Rey (2014) 223 Cal.App.4th 221, 166 Cal.Rptr.3d 864, that a "plaintiff must have 'either ownership and the right of possession or actual possession [of the property] at the time of the alleged conversion thereof.' " (Id . at p. 233, 166 Cal.Rptr.3d 864 (italics added), quoting General Motors A. Corp. v. Dallas (1926) 198 Cal. 365, 370, 245 P. 184.) To the extent Rutherford Holdings suggests right to possession alone is an insufficient basis to support a conversion claim, the case is directly contrary to the authorities cited above, including the Supreme Court's 2015 decision in Lee v. Hanley , supra , 61 Cal.4th at page 1240, 191 Cal.Rptr.3d 536, 354 P.3d 334. (See also Wiseman & Reese, *177 Cal. Practice Guide: Civil Procedure Before Trial, Claims and Defenses (The Rutter Group 2016) ¶ 12:100; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 699.) We follow the Supreme Court's recent pronouncement in Lee v. Hanley , as well as the weight of other authority, that a plaintiff can base a cause of action for conversion on either ownership or right of possession.
Respondents assert that "contractual rights to purchase or obtain the property at issue are not sufficient" to support a cause of action for conversion. However, the cases they cite only stand for the proposition that "a mere contractual right of payment , without more, will not suffice." (Farmers , supra , 53 Cal.App.4th at p. 452, 61 Cal.Rptr.2d 707 (italics added); accord Rutherford , supra , 223 Cal.App.4th at p. 233, 166 Cal.Rptr.3d 864 ; see also PCO, Inc. , supra , 150 Cal.App.4th at p. 395, 58 Cal.Rptr.3d 516 [" 'Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.' "].) Applied's claim for conversion of stock is not a contractual right of payment and does not fall within that rule.
The claim in the present case is similar to that in Cerra v. Blackstone (1985) 172 Cal.App.3d 604, 218 Cal.Rptr. 15. There, the defendant took possession of an automobile that secured an auto loan and, according to the plaintiff's evidence in opposition to a motion for summary judgment, refused to return the vehicle after the plaintiff tendered the amount owed. (Id. at pp. 606-607, 218 Cal.Rptr. 15.) The court concluded, "[o]nce it is determined that [plaintiff] has a right to reinstate the contract, he has a right to possession of the vehicle and standing to bring conversion. Unjustified refusal to turn over possession on demand constitutes conversion even where possession by the withholder was originally obtained lawfully." (Id. at p. 609, 218 Cal.Rptr. 15.) The present case, in which Thomas allegedly refused to transfer the stock following Applied's repurchase, is analogous. (See also Wade v. Markwell & Co. (1953) 118 Cal.App.2d 410, 418, 258 P.2d 497 ["Having thus alleged a demand accompanied by sufficient tender, defendant's refusal to restore her coat, and certain other facts tending to show defendant's fraudulent dominion over the coat inconsistent with her right to immediate possession, the complaint contains all the requisites of a cause of action for conversion."].) The trial court erred in concluding Applied's right to possess the shares after exercise of its repurchase rights was an insufficient basis for the conversion claim.
In its opinion granting the motion for summary judgment, the trial court also briefly addressed whether Applied would have a valid conversion claim if, as Applied claimed, the company automatically regained ownership of the shares after exercise of its repurchase rights. The court concluded Applied's claim would fail in that instance because "Thomas would no longer have any ability to exert dominion over the shares, a required element of conversion." The court did not cite authority for that proposition. On appeal, respondents echo the court's statement and also assert, again without citation to authority, that "[i]f Applied already owned the shares, returning the assignment form did not transfer title to the shares and therefore was a meaningless act involving a useless piece of paper." We decline to affirm on that ground, because we cannot conclude as a matter of law that Thomas's conduct was insufficient to support the conversion claim.
"[A]ny act of ownership or exercise of dominion over the property of another, *178 in defiance of his rights, is a conversion of that property." (Bancroft-Whitney Co. v. McHugh (1913) 166 Cal. 140, 143, 134 P. 1157.) As explained in Mears v. Crocker First Nat. Bank (1948) 84 Cal.App.2d 637, 644, 191 P.2d 501 (Mears ), it is "well settled in California that shares of corporate stock are subject to an action in conversion" and "it is not necessary that possession of the certificate evidencing title be disturbed." Instead, it is sufficient that there is interference with the owner's "free and unhampered right to dispose of property without limitations imposed by strangers to the title." (Ibid. )
In the present case, regardless of whether Applied needed the executed stock assignment form to engage in any transactions related to the shares, there is at least a disputed issue of fact whether Thomas's conduct actually interfered with Applied's control over the shares by creating a dispute on the issue of ownership. (See Mears , supra , 84 Cal.App.2d at p. 644, 191 P.2d 501 ["One of the incidents of ownership is the free and unhampered right to dispose of property without limitations imposed by strangers to the title."].) Thomas's failure to execute the stock assignment form, accompanied by his refusal to cash Applied's check, could reasonably be viewed as an assertion by Thomas that he continued to own the shares. There is evidence that this was Applied's understanding and that the company did not believe it could treat the stock as belonging to it: Applied's Chief Accounting Officer averred the Accounting Department was required to reverse accounting entries reflecting company ownership of the shares until Thomas transmitted executed stock powers and cashed the company's check.
On the record before this court, a reasonable jury could find Thomas's actions frustrated Applied's "free and unhampered right" to control the shares following exercise of its repurchase rights. (See Ralston v. Bank of California (1896) 112 Cal. 208, 212-213, 44 P. 476 [conversion claim where defendant corporation refused to register a transfer of shares]; Mears , supra , 84 Cal.App.2d at p. 639, 191 P.2d 501 [conversion claim where defendant transfer agent refused to convert shares into blocks of shares for sale on stock exchange]; Jackins v. Bacon (1923) 63 Cal.App. 463, 466-468, 218 P. 1027 [conversion claim where defendant refused to surrender shares for cancellation even though plaintiff was in possession of the original certificates].) Indeed, respondents strenuously argued below and on appeal that Applied did not regain ownership of the shares upon the company's exercise of its repurchase rights, and respondents cite no authority the interference at issue in the present case is insufficient to support a conversion claim. The trial court's order cannot be affirmed on the ground that Thomas's conduct does not support a conversion claim as a matter of law.
III. Applied's Fraud Claims
On June 24, 2014, a little less than two years after the filing of the original complaint, Applied sought leave to file the SAC to add causes of action for fraudulent concealment (the fifth cause of action; against Thomas and IVP), aiding and abetting fraudulent concealment (the sixth cause of action; against Dennis), and breach of fiduciary duty (the seventh cause of action; against Thomas). The SAC was filed on August 15.[11] Those fraud-based *179 claims arise from Thomas's alleged failure to disclose his stock-sharing agreement with his partners. Applied alleged that, had it known, it would not have awarded stock options to Thomas, or it would have cancelled them. Applied contends the trial court erred in concluding its fraud claims are time-barred under the three-year statute of limitations in Code of Civil Procedure section 338. We reject Applied's contentions.
A. The Discovery Rule
Applied contends its fraud claims are timely under the discovery rule. "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (Fox v. Ethicon Endo-Surgery, Inc. (2005) 35 Cal.4th 797, 806-807, 27 Cal.Rptr.3d 661, 110 P.3d 914 (Fox ).) " 'The policy reason behind the discovery rule is to ameliorate a harsh rule that would allow the limitations period for filing suit to expire before a plaintiff has or should have learned of the latent injury and its cause.' " (Pooshs v. Philip Morris USA, Inc. (2011) 51 Cal.4th 788, 797-798, 123 Cal.Rptr.3d 578, 250 P.3d 181.)
"[W]hen a plaintiff relies on the discovery rule or allegations of fraudulent concealment, as excuses for an apparently belated filing of a complaint, 'the burden of pleading and proving belated discovery of a cause of action falls on the plaintiff.' " (Czajkowski v. Haskell & White, LLP (2012) 208 Cal.App.4th 166, 174, 144 Cal.Rptr.3d 522 (Czajkowski ); see also April Enterprises, Inc. v. KTTV (1983) 147 Cal.App.3d 805, 833, 195 Cal.Rptr. 421 [" 'It is plaintiff's burden to establish "facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." ' "].) "[T]he plaintiff claiming delayed discovery of the facts constituting the cause of action has the burden of setting forth pleaded facts to show ' "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." ' " (Czajkowski , at p. 175, 144 Cal.Rptr.3d 522 ; see also Fox , supra , 35 Cal.4th at p. 808, 27 Cal.Rptr.3d 661, 110 P.3d 914.)
B. Application of the Discovery Rule
The trial court concluded Applied "learned of the proceeds-sharing arrangement in February 2011" and, therefore, was required to assert its claims by February 2014. The court was referring to a conversation Thomas and Applied's CEO Hilal had around the time of a February 2011 Board meeting. According to Hilal's declaration submitted in opposition to summary judgment, on or around February 24, 2011, "Thomas indicated ... that he 'might share' the proceeds of the stock options awarded to him by Applied ... with his partners at IVP." Hilal averred that the suggestion "surprised" him "because it was completely contrary to the reason that the Company adopted a stock option program for directors in the first place-to compensate directors for their individual service." Hilal reacted negatively, and Thomas said Hilal "misunderstood." According to Hilal, "Thomas said that he was only thinking about sharing his stock options, and that he had not actually decided to share the proceeds of his options with IVP." Hilal averred in his declaration that he "understood *180 from Mr. Thomas'[s] use of the word 'probably' that he had the choice of either sharing or not sharing the proceeds of his stock options with his partners in the event that he exercised his options and purchased the resulting shares. Moreover, his suggestion that he 'might share' the options with IVP conveyed to me that he had not made a decision to do so, and that he still had a choice in the matter." Hilal averred that Thomas did not disclose the existence of any stock-sharing agreement.
On appeal, Applied argues "Thomas' partial and misleading disclosure in February 2011 did not alert Applied Medical to its injury: i.e., that Thomas had fraudulently induced the Company into awarding stock options to Thomas in his individual capacity when, at the time of those awards, Thomas actually" had a secret agreement to share the stock with his partners. Applied argues Thomas's reassuring response relieved Applied of any obligation to bring suit. It cites Unruh-Haxton v. Regents of the University of California (2008) 162 Cal.App.4th 343, 76 Cal.Rptr.3d 146, where patients who received fertility treatments learned in the news that their doctors had stolen genetic material from patients. (Id. at p. 349, 76 Cal.Rptr.3d 146.) A trial court sustained a demurrer to a resulting suit, holding the action was untimely as a matter of law because the patients should have suspected injury earlier. (Ibid. ) The court of appeal reversed, noting that plaintiffs had received "incomplete medical records and reassuring telephone calls" and the reasonableness of the plaintiffs' reliance on those assurances could not be decided as a matter of law. (Id. at p. 367, 76 Cal.Rptr.3d 146.)
Were Hilal's account of the February 2011 conversation with Thomas the only relevant evidence in the record, we would agree the trial court erred in granting summary judgment. The conversation as described by Hilal did not constitute disclosure of the stock-sharing agreement. Instead, Thomas allegedly disclosed only that he might share the proceeds and he did not indicate any sharing would be pursuant to an agreement. Thomas's alleged statements did not as a matter of law notify Applied of its injury or trigger Applied's duty to investigate. Based on Hilal's account alone, application of the discovery rule would be a disputed issue of fact. (See Broberg v. Guardian Life Ins. Co. of America (2009) 171 Cal.App.4th 912, 921, 90 Cal.Rptr.3d 225 ["When a plaintiff reasonably should have discovered facts for purposes of the accrual of a case of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence ... can support only one reasonable conclusion."].)
However, Hilal's account is not the only evidence in the record. The trial court made reference to a December 2011 e-mail in which Applied's general counsel wrote to Thomas, "[Hilal] mentioned a discussion during the Applied Board meeting in February [2001], regarding the Applied stock options granted to you over the years. Our understanding is that you have an arrangement with IVP by which your Applied stock options are shared with your partners." Applied asked Thomas to relinquish his stock options because "the arrangement is inconsistent with the purpose of Applied's outside director option program." That e-mail demonstrates that, despite the ambiguous nature of Thomas's comments as described by Hilal, Applied actually had knowledge of the stock-sharing agreement when the e-mail was sent. Because Applied does not allege any other communications from Thomas about the stock-sharing agreement, the December 2011 e-mail reveals that Hilal actually understood Thomas's comments as a disclosure of a stock-sharing agreement, that *181 Applied actually suspected and uncovered Thomas's alleged wrongdoing after the February communication, or that Applied learned about the stock-sharing agreement through some other means, either before or after the February 2011 meeting.
Although the record does not reflect precisely when Applied learned of the stock-sharing agreement, it was Applied's burden in claiming delayed discovery to set forth facts showing " ' "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." ' " (Czajkowski , supra , 208 Cal.App.4th at p. 175, 144 Cal.Rptr.3d 522 ; see also Fox , supra , 35 Cal.4th at p. 808, 27 Cal.Rptr.3d 661, 110 P.3d 914.) As explained by the California Supreme Court, "if an action is brought more than three years after commission of the fraud, plaintiff has the burden of pleading and proving that he did not make the discovery until within three years prior to the filing of his complaint. [Citations.] Further, ... plaintiff must affirmatively excuse his failure to discover the fraud within three years after it took place, by establishing facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." (Hobart v. Hobart Estate Co. (1945) 26 Cal.2d 412, 437, 159 P.2d 958 ; accord Sun'n Sand, Inc. v. United California Bank (1978) 21 Cal.3d 671, 701-702, 148 Cal.Rptr. 329, 582 P.2d 920 ; Cansino v. Bank of America (2014) 224 Cal.App.4th 1462, 1472, 169 Cal.Rptr.3d 619 ; Investors Equity Life Holding Co. v. Schmidt (2011) 195 Cal.App.4th 1519, 1533, 126 Cal.Rptr.3d 135 ; see also Samuels v. Mix (1999) 22 Cal.4th 1, 14, 91 Cal.Rptr.2d 273, 989 P.2d 701 [distinguishing wording of statute of limitations in attorney malpractice actions from that applicable to fraud actions].) Absent an explanation from Applied as to when prior to December 2011 it acquired knowledge of the stock-sharing agreement, and why it could not have acquired such knowledge earlier, the trial court properly concluded Applied could not rely on the delayed discovery rule to defeat respondents' motion for summary judgment.
That Thomas was in a fiduciary relationship with Applied by virtue of membership on the Board does not change the result. (See WA Southwest 2, LLC v. First American Title Ins. Co. (2015) 240 Cal.App.4th 148, 157, 192 Cal.Rptr.3d 423 (WA Southwest 2 ) [" ' "when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary" ' "].) Even if Applied was, as it asserts, "entitled to take Thomas at his word when he said that he was merely 'thinking' of sharing his Applied stock with his partners," the December 2011 e-mail from Applied's general counsel shows that the company was not actually misled or that it had knowledge of the stock-sharing agreement through other means.[12] It is *182 Applied's failure to present evidence of the time and manner of discovery, and its inability to have made earlier discovery, that is fatal to its reliance on the discovery rule to overcome the statute of limitations.[13]
C. The Relation-Back Doctrine
We also reject Applied's contention that its fraud-based claims are timely because they relate back to the claims in Applied's original complaint, filed in August 2012. "The relation-back doctrine requires that the amended complaint must (1) rest on the same general set of facts , (2) involve the same injury , and (3) refer to the same instrumentality , as the original one." (Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 408-409, 87 Cal.Rptr.2d 453, 981 P.2d 79.) Applied's original claims rest on Thomas's refusal to return a stock-assignment form after the company exercised its repurchase right in February 2012. The fraud-based claims rest on Thomas's alleged failure to disclose the stock-sharing agreement on multiple occasions beginning in December 2003, when Applied began issuing stock options to Thomas.
The fraud claims in the SAC involve different facts establishing liability, different injuries, and different instrumentalities from the claims in the original complaint. The claims in the original complaint allege defendants deprived Applied of its stock repurchase rights starting in February 2012. The fraud claims in the SAC allege that, beginning at least by December 2003, Thomas concealed the stock-sharing agreement from Applied, causing Applied to issue stock options it would not otherwise have awarded to Thomas. Although both sets of claims relate to the stock options issued to Thomas, the claims rest on different sets of facts (2012 delay in stock repurchase vs. concealment of stock-sharing agreement starting in 2003), different injuries (loss of repurchase rights vs. undue issuance of stock options), and different instrumentalities (delay in returning stock assignment form vs. concealment of material facts regarding ownership of stock options). (Cf. Norgart , supra , 21 Cal.4th at p. 409, 87 Cal.Rptr.2d 453, 981 P.2d 79 [relation back doctrine would apply where, although later claim involves a different defendant, all claims relate to same allegedly wrongful death].)
The dissent suggests the original complaint alleged Thomas's secret stock-sharing agreement was a breach of the stock option agreements. That is not how we read the complaint. In the "Summary of the Action" the complaint alleges "Thomas and the Fund share a common motivation to inappropriately inflate" the stock repurchase price because "Thomas has entered into a side agreement ... under which any stock compensation awarded to Mr. Thomas as a director of Applied Medical will be shared with the Fund and/or one or more of its general partners." Then the complaint includes a background allegation *183 that defendants were motivated to inflate the valuation because "Thomas is obligated through a secret agreement with the Fund and/or one or more of its general partners to share any stock awards he received during his service as a director." Thus, the stock-sharing agreement is described as a motivation for Thomas's delay in returning the stock-assignment form. There are no allegations that concealment of the agreement resulted in the undue issuance of options. And, more fundamentally, the causes of action in the original complaint are based entirely on Thomas's delay and the identified injury is Applied's loss of repurchase rights. Phrasing it slightly differently, the background allegations regarding concealment provide no factual basis for any element of the causes of action in the original complaint. We are aware of no authority requiring this court, in applying the relation back doctrine, to treat the original claims as encompassing stray, undeveloped background allegations in the complaint that refer to different injuries at different times. That is a step we are not prepared to take.
Applied contends the fraud claims relate back because, like the contract and conversion claims, they involve "Thomas's malfeasance with respect to his stock option agreements." Similarly, the dissent refers to "Thomas's misappropriation of stock options in violation of the stock option agreements and Applied's property interests." But we are aware of no authority supporting the proposition the relation-back doctrine applies wherever a plaintiff can define the defendant's misconduct in sufficiently general terms to encompass all of the claims at issue. (See Massey v. Mercy Medical Center Redding (2009) 180 Cal.App.4th 690, 698, 103 Cal.Rptr.3d 209 [amended medical malpractice complaint that alleges different negligent act does not relate back].) Neither appellant nor the dissent has been able to identify any cases applying the relation back doctrine in circumstances similar to those in the present case, where the sets of claims involve different injuries occurring years apart. We conclude Applied has not shown the relation-back doctrine applies.
As explained above, the trial court properly concluded respondents were entitled to summary adjudication of Applied's fraud-based claims.[14]
DISPOSITION
The judgment is reversed. The trial court's order on respondents' motion for summary judgment is reversed to the extent it granted summary adjudication of Applied's claims for breach of contract, conversion, and aiding and abetting conversion; summary adjudication of the remaining claims is affirmed. The case is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.
I concur.
BRUINIERS, J.

"On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (Miller v. Department of Corrections (2005) 36 Cal.4th 446, 460, 30 Cal.Rptr.3d 797, 115 P.3d 77 (Miller ).) Our factual summary reflects that standard of review.

Respondents Dennis and Thomas described the agreement as a "proceeds-sharing arrangement" in their declarations in support of the summary judgment motion. Because the declarations do not suggest participation is optional, we use the term agreement for the purposes of this decision. The parties apparently dispute whether the agreement involved the sharing of stock ownership or only of the proceeds of stock sales. We need not resolve that question and will refer in this decision to the "stock-sharing agreement" for the sake of convenience. Thomas also had a written agreement with his general partners at IVM that arguably required sharing of the proceeds of stock sales.

Respondents contend Thomas disclosed the stock-sharing agreement in an October 2003 e-mail to Hilal, in which he said "I think it's fair to give me an option, but it turns out that those shares will actually become IVP [IV] shares eventually and so the amount that I get from it will be about 15% based on my ownership of the IVP IV fund. That is just a policy we have and although I'd like to have them all because I believe in the company, the policy isn't something that I can change." That e-mail was not included in respondents' separate statement of undisputed facts; instead, it was presented to the trial court for the first time when respondents filed their reply brief in support of their motion for summary judgment. Although the trial court denied appellant's motion to strike any references to the 2003 e-mail, the court did not refer to the 2003 e-mail in granting respondents' motion for summary judgment. We need not address the propriety of considering that e-mail in support of the motion for summary judgment because, like the trial court, we conclude Applied's fraud claims are untimely without reference to the 2003 e-mail.

According to the SAC, the trial court previously sustained a demurrer to the second cause of action for breach of the implied covenant of good faith and fair dealing and the SAC stated the claim was "realleged ... solely to preserve the claim for purposes of appeal." No contentions regarding that cause of action have been asserted in the present appeal.

Applied does not challenge the trial court's grant of summary judgment on the eighth cause of action for declaratory relief on the ground of mootness.

See footnote *, ante.

Respondents contend the relevant date for statute of limitations purposes is in August 2014, when the SAC was filed with approval of the court, rather than when Applied sought leave to file the SAC in June. However, as respondents acknowledge, it makes no difference which date is considered for statute of limitations purposes.

In response to the December 2011 e-mail, Thomas said, "I own the shares and the shares are never going to be in any name but my name," and "[w]hether I share some of the proceeds of the sale in the future is my business and my sharing of the information with Said [Hilal] that I would probably share the benefits is for information only." Applied argues Thomas failed in that response to comply with his fiduciary obligation to fully disclose and describe the stock-sharing agreement. However, the December 2011 email reflected Applied's actual knowledge, or at least serious suspicion, of the existence of such an agreement; the limitations period commenced when that knowledge was acquired. (WA Southwest 2, supra, 240 Cal.App.4th at p. 157, 192 Cal.Rptr.3d 423 ["even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs, this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty"].) Thomas's response to the December 2011 e-mail did not deny there was an arrangement to share stock proceeds and did not toll the running of the statute of limitations that had previously commenced.

Because we affirm the trial court's decision based on the evidence of the February 2011 conversation and the December e-mail, and Applied's failure to show it did not or could not have learned of the agreement within the limitations period, we need not consider the propriety of considering the 2003 e-mail from Thomas to Applied disclosing "a policy" under which his "shares will actually become IVP shares eventually and so the amount that I get from it will be about 15% based on my ownership of the IVP IV fund." (See ante p. 172, fn. 3.)

In light of this conclusion, it is unnecessary to consider respondents' additional contentions challenging the bases for liability against respondents IVP and Dennis. Neither need we consider Applied's contention the trial court erred by denying Applied leave to file the TAC, because Applied does not argue its amendments would have affected this court's analysis on the fraud claims.